**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| YSM REALTY and DAVID SCOP,<br><br>                  Plaintiffs,<br><br>v.<br><br>MARVIN GROSSBARD and PRESIDENT<br>CONTAINER, INC.,<br><br>                  Defendants. | Civil Action No.: 10-5987 (JLL)<br><br><br>**OPINION** |

       This matter comes before the Court by way of: (1) Plaintiffs YSM Realty ("YSM") and David Scop ("Scop")'s Motion for Summary Judgment [Docket Entry No. 48]; and (2) Defendants Marvin Grossbard ("Defendant Grossbard") and President Container, Inc. ("President")'s Motion for Summary Judgment [Docket Entry No. 49]. The Court has considered the submissions of the Parties in support of and in opposition to the instant motion, and decides the motion on the papers pursuant to Fed. R. Civ. P. 78. For the reasons stated herein, Defendants Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Summary Judgment is DENIED.

## I.  BACKGROUND

       In this action, Plaintiffs are seeking to recover a commission fee allegedly earned on the sale of a New York property to Defendants. Plaintiff YSM was formed and is solely owned by Plaintiff Scop and incorporated in New York since 2006. (Defs 56.1 Stmt., ¶¶ 6-7; Pls. Responsive Stmt., ¶¶ 6-7). Plaintiff Scop holds the corporate real estate broker license for YSM,

and YSM has continuously acted as a real estate sales office from its inception until the present day.  (Id., ¶¶ 8-9).   Defendant President is a company founded by Defendant Grossbard and his now-deceased brother George Grossbard.  (Id., ¶ 1).  President is in the business of manufacturing corrugated cardboard products, such as shipping containers and point-of-sale displays.  (Id. ¶ 101; Defs. Mot. for Summ. J., Decl. of R. Scott LaFazia ("LaFazia Decl."), ¶ 4).  Defendant Grossbard is the President of Defendant President.  (Id. ¶ 2).  Larry Grossbard is Defendant Grossbard's son and serves as the Vice President of President and a Managing Member of Defendant SP Realty Associates II, LLC ("SP Realty").  (Id. ¶ 3; Decl. of R. Scott LaFazia ("LaFazia Decl."), ¶ 5).  President owns SP Realty, and SP Realty owns the real property known as and located at 290 Ballard Road, in the Town of Wallkill, New York.  (Id. ¶ 4; LaFazia Decl. ¶¶ 6-7; Shimko Decl., Ex. C, at 8, 12-13, 17-19).  This action arises out of Plaintiffs' claims of breach of contract, unjust enrichment and fraudulent inducement, resulting from Defendants' failure to compensate Plaintiffs the Buyer's brokerage commission of one percent (1%) of the purchase price of a New York property Defendants purchased.

As of the date of this Opinion, Plaintiff YSM has been dissolved for over one year by proclamation of the New York Secretary of State.  (Id. ¶ 11; Defs. Mot. for Summ. J., Decl. of Gardiner S. Barone ("Barone Decl."), Ex. G).  Plaintiff Scop has continuously held a license as an attorney in New York since 1999, and has intermittently held a real estate broker's license since at least May 10, 2006.  (Id. ¶¶ 12, 18; Pls. Mot. for Summ. J., Decl. of Daniel Shimko ("Shimko Decl."), Ex. A, at 5, 18-19).  Specifically, Mr. Scop had an active real estate broker's license on May 10, 2006, which automatically expired on May 10, 2008.  (Id. ¶ 12; Barone Decl., Ex. F).  Between May 11, 2008 and December 19, 2008, YSM was operating without a corporate

2

real estate broker's license.  (Id. ¶ 14; Barone Decl., Ex. F).  Mr. Scop renewed his real estate

broker's license on December 20, 2008, and it automatically expired on December 19, 2010.  (Id.

¶¶ 13, 16; Barone Decl., Ex. F).  Mr. Scop again renewed his real estate broker's license on

February 29, 2011.  (Id. ¶ 17; Barone Decl., Ex. F).

On or before May 2007, President was interested in purchasing property to relocate its

manufacturing operations, which were then located in Moonachie, New Jersey.  (Id. ¶ 37; Barone

Decl., Ex. C, at 26; Shimko Decl., Ex. B, at 9-11).  Around that time, Defendant Grossbard was

at his vacation home when he encountered Plaintiff Scop on the pathway outside of his home.

(Id. ¶ 38; Barone Decl., Exs. C, at 27; L, at 27, 31; Shimko Decl., Ex. B, at 27-28, 31).

Defendant Grossbard knew Plaintiff Scop as an attorney who had performed some legal work for

President in the past and who had been representing President in two small cases around the time

of the conversation.  (Pls. 56.1 Stmt., ¶¶ 52-53; Defs. Responsive Stmt., ¶¶ 52-53; Shimko Decl.,

Ex. B, at 42-43).  Defendant Grossbard cannot recall whether the meeting with Plaintiff Scop

occurred in 2007 or 2008, but does not dispute that a conversation occurred between himself and

Mr. Scop outside of his vacation home.  (Id. ¶¶ 33-35; Shimko Decl., Ex. B, at 32).[1]  Plaintiff

Scop and Defendant Grossbard engaged in a conversation, and Mr. Grossbard spoke of

President's interest in purchasing property to relocate its manufacturing operations to a larger

facility than the Moonachie, New Jersey facility.  (Defs. 56.1 Stmt., ¶¶ 39-40; Pls. Responsive

Stmt., ¶¶ 39-40; Barone Decl., Ex. C, at 26-27; Shimko Decl., Ex. B, at 34).  In looking to

purchase a property, President required that the property have immediate rail access, and also

_____

[1]Plaintiff Scop testified that the meeting at which Defendant Grossbard spoke with him
regarding President's desire to relocate was Memorial Day Weekend 2007.  (Shimko Decl., Ex.
A, at 26).

3

wanted property with government financial incentives, such as tax breaks and tax abatements, that were readily available. (Id. ¶¶ 44-45, Barone Decl., Ex. C, at 30, 43-44). Plaintiff Scop informed Defendant Grossbard that he was "in real estate," but Mr. Grossbard does not recollect whether he told Mr. Scop at that time what the specifications of the property were that President would require. (Pls. 56.1 Stmt., ¶¶ 41, 43-44; Defs. Responsive Stmt., ¶¶ 41, 43-44; Shimko Decl., Ex. B, at 35, 38-40). Plaintiff Scop asserts that he offered Defendant Grossbard his real estate services during that conversation, that Mr. Grossbard gave him detailed requirements for the relocated property, and that Plaintiff Scop would attempt to receive a commission from the seller of the property, although Mr. Grossbard does not recollect this. (Id. ¶¶ 48-49; Shimko Decl., Ex. A, at 28-29). Further, Plaintiff Scop stated that Defendant Grossbard agreed to pay Plaintiff Scop the commission fee directly in the event that the seller wouldn't pay him the fee directly, and while Defendants do not dispute that Plaintiff Scop did so testify, they dispute that such an agreement was reached. (Id. ¶¶ 50-51; Shimko Decl., Ex. A, at 29). No written agreement or confirmation was made of any agreement discussed between the Parties during their conversation outside Defendant Grossbard's vacation home. ((Defs. 56.1 Stmt., ¶¶ 41-42; Pls. Responsive Stmt., ¶¶ 41-42).

As of October 12, 2007, Plaintiff Scop was a co-broker with Heshy Zweig ("Mr. Zweig") with respect to the property at issue in this matter and President's interest in said property. (Id.. ¶¶ 23-24). While Mr. Zweig did not have a real estate broker's license until December 20, 2007, which license expired on December 19, 2009, Scop agreed to split any commissions he received from the sale of the property at issue here on or about June or July 2007. (Id. ¶¶ 25-26, 27-28; Barone Decl., Exs. I; C, at 59-60; D, at 73). On or about July 2007, Mr. Scop told Mr. Zweig

4

that he was looking for real property matching Defendants' requirements as he believed them to be set forth by Defendant Grossbard.  (Id. ¶ 58; Barone Decl., Ex. C, at 53-54; Shimko Decl., Ex. A, at 37-38).  While Defendants were looking for property to purchase, Plaintiff Scop searched for properties listed for sale and, according to Plaintiff Scop, Mr. Zweig searched on LoopNet for properties listed for lease.  (Id. ¶¶ 43, 63, 97; Barone Decl., Ex. C, at 30, 55-56).

Mr. Zweig subsequently spoke with James Tully ("Mr. Tully"), a real estate broker affiliated with CBRE Group, Inc.  (Id. ¶¶ 30, 62; Barone Decl., Exs. J, at 4; Q, at 22; Shimko Decl., Ex. D, at 9-10, 14).  CBRE Group, Inc. and Mr. Tully were leasing agents for Panattoni Developer, the owner of the property located at 260-290 Ballard Road in the Town of Wallkill, New York (hereinafter "Panattoni Business Center" or "PBC"), and Mr. Tully was responsible for marketing and finding tenants for the PBC.  (Id. ¶¶ 31, 35; Barone Decl., Ex. J, at 9-15).  Panattoni Developer had purchased the PBC as investment property, with the revenue to come from its tenants.  (Id. ¶ 32;  Barone Decl., Ex. J, at 195-196).  The PBC at that time consisted in two buildings: one was around 180,000 square feet (located at 260 Ballard Road) and the other was around 522,000 square feet (located at 290 Ballard Road), both of which were on a single, undivided tax lot.  (Id. ¶¶ 33-34; Barone Decl., Exs. C, at 61; K; J, at 77-78).  On or about June or July 2007, after speaking with Mr. Tully, Mr. Zweig informed Mr. Scop that Mr. Zweig had found the PBC property.  (Id. ¶ 59, 61; Barone Decl., Exs. C, at 53-55; K).  When Mr. Zweig identified the PBC to Plaintiff Scop, Plaintiff Scop and Mr. Zweig agreed to split commissions for finding said property for Defendants.  (Id. ¶ 60; Barone Decl., Ex. C, at 59-60, 86).

According to Mr. Zweig's testimony, he communicated with Mr. Tully to introduce him to Mr. Scop and to arrange a showing of the PBC.  (Id. ¶ 64; Barone Decl., Exs. K; Q, at 27).

Plaintiff Scop informed Defendants about the PBC property.[2]  Plaintiff states that, when he notified Defendant Grossbard about the property and on numerous occasions afterwards, Plaintiff told Defendant that the seller would not be paying Plaintiff's commission, but Defendants dispute the accuracy of such statements.  (Pls. 56.1 Stmt., ¶¶ 58-59; Defs. Responsive Stmt., ¶¶ 58-59; Shimko Decl., Ex. A, at 51-53).  Defendant Grossbard only recalls that Plaintiff Scop told him that he found a property that he wanted to show him.  (Id. ¶ 62; Shimko Decl., Ex. B, at 44-47).

Defendants contend that Defendant Grossbard and Larry Grossbard viewed the PBC property in an August 1, 2007 showing, but Plaintiffs deny that fact and assert that Mr. Zweig is the only person who knows of or recalls a walkthrough of the property on that date, even though he was not present.  (Id. ¶¶ 79-80; Shimko Decl., Exs. A-D).  The Parties agree that a viewing of the property occurred after Plaintiff Scop told Defendant Grossbard about it, that Defendant Grossbard admitted that, if Plaintiff Scop was "showing [him] something he must have been a broker," and that Defendant Grossbard was not in communication with any real estate broker or owner other than Plaintiff Scop about setting up the very first viewing of the PBC property.  (Pls. 56.1 Stmt., ¶¶ 63, 65, 75, 82; Defs. Responsive Stmt., ¶¶ 63, 65, 75, 82; Shimko Decl., Ex. B, at 46, 49, 61-62, 78).  They also agree that the PBC continued to be marketed to prospective tenants for leasing, not for sale, between August 1, 2007 and January 3, 2008, and Mr. Tully was only authorized to lease the PBC during that period, not to sell it.  (Defs. 56.1 Stmt., ¶¶ 95-96; Pls.

_____

[2]The Parties dispute the date that Plaintiff Scop told Defendant Grossbard about the property, with Defendants asserting that it was before August 1, 2007 because that was the date that Mr. Zweig testified Plaintiff Scop showed Defendants the 290 Ballard Road property.  (Defs. Responsive Stmt., ¶ 56).

Responsive Stmt., ¶¶ 85-96; Barone Decl., Exs. C, at 55; J, at 37-38, 203).  Also during that time,

290 Ballard Road was not subdivided from the parent parcel, the PBC, and 290 Ballard Road was

set up as a distribution center for Wakefern Corporation (commonly known as "Shop-Rite"), not

as a manufacturing center.  (Id. ¶¶ 61, 99-100; Barone Decl., Exs. B, at 40-41, 53; C, at 61; D, at

46; J, at 10-11).  Therefore, the PBC at that time did not contain any manufacturing equipment

and required extensive reconfiguration to be suitable to Defendants' purposes, such as: replacing

the 6" concrete floors with 8" floors to support machinery; concrete pits to support Defendants'

machinery; moving or removing several columns; improvement in lighting and ventilation; and

removal of over ninety doors and several walls.  (Id. ¶¶ 102-104; Barone Decl., Exs. B, at 41; T;

LaFazia Decl., ¶¶ 35-36).  Finally, during that time, 290 Ballard Road did not have any known

existing government incentives, such as Empire Zone benefits, which would be readily available

to Defendant President.  (Id. ¶ 105; Barone Decl., Ex. J, at 207-08).

Plaintiff Scop began scheduling a showing of the PBC in September or October 2007.

(Id. ¶ 81; Barone Decl., Ex. C, at 47-48).  On December 31, 2007, Mr. Scop requested

information about the PBC property from Mr. Tully.  (Id. ¶ 94; Barone Decl., Ex. R).  Plaintiffs

assert that Plaintiff Scop and Mr. Tully then first showed the PBC to Defendants on January 3,

2008.  (Id. ¶ 93; Barone Decl., Ex. C., at 50).  The Parties agree that Defendant Grossbard was at

the viewing with Plaintiff Scop, Mr. Tully, and his son Larry Grossbard.  (Pls. 56.1 Stmt., ¶¶ 77-

78; Defs. Responsive Stmt., ¶¶ 77-78; Shimko Decl., Exs. B, at 69-70; C, at 38-39).  As of that

date in January 2008, the PBC already had a tenant at 290 Ballard Road.  (Defs. 56.1 Stmt., ¶ 98;

Pls. Responsive Stmt., ¶ 98; Barone Decl., Exs. D, at 76; J, at 179-80; S).  At the showing,

Plaintiff Scop alleges that Defendant Grossbard asked him, "What exactly am I paying you for

7

this property?," and that Plaintiff Scop answered, "one percent."  (Pls. 56.1 Stmt., ¶¶ 83-84;

Defs. Responsive Stmt., ¶¶ 83-84; Shimko Decl., Ex. A, 146).  After so answering, Plaintiff Scop

states that he and Defendant Grossbard shook hands.  (Id. ¶ 85; Shimko Decl., Ex. A, at 146-47).

However, Defendants did not make a formal offer to purchase the PBC on January 3, 2008, and

after that viewing, Defendants continued looking at other properties to purchase.  (Defs. 56.1

Stmt., ¶¶ 107-08; Pls. Responsive Stmt., ¶¶ 107-08; Barone Decl., Ex. J, at 71, 72, 91, 98).

    The Parties contest when Defendants expressed interest in purchasing the PBC, with

Defendants contending that it was only after Mr. Tully sent them six letters, beginning on or

about May 27, 2008, regarding 290 Ballard Road, and Plaintiffs alleging that Defendants

expressed immediate interest.  (Id. ¶ 11; Barone Decl., Ex. S; Shimko Decl., Ex. A, at 71-73).

On May 27, 2008, it is not disputed that Mr. Tully sent Defendants a letter which Mr. Tully

requested them to sign if the terms contained therein crystallized Defendants' terms to become

interested in purchasing 290 Ballard Road.  (Id. ¶ 112; Barone Decl., Exs. J, at 89-90; S).

Defendants did not sign the May 27, 2008 letter, and Mr. Tully sent them another letter, dated

June 5, 2008, describing the owner's terms for selling 290 Ballard Road.  (Id. ¶¶ 113-14; Barone

Decl., Exs. J, at 105-07; S).  Mr. Tully asserts that Defendants responded to said letter, notifying

him that the asking price for 290 Ballard Road was too high.  (Id. ¶ 115; Barone Decl., Ex. J, at

108).  Mr. Tully then sent Defendants a letter on September 19, 2008 with a reduced asking price

from $32.9 million down to $31.35 million.  (Id. ¶¶ 116, 118; Barone Decl., Exs. J, at 107, 115-

16, 121; S).  The Parties dispute whether Defendants considered this price too high, with

Plaintiffs asserting that they did not and Defendants stating that they did.  (Id. ¶ 119; Barone

Decl., Ex. J at 121).  In a letter dated October 3, 2008, Mr. Tully sent Defendants a letter in an

attempt to get them to sign a preliminary letter of general intentions to purchase 290 Ballard Road.  (Id. ¶ 120; Barone Decl., Ex. J, at 126-27).  Defendants did not sign said preliminary letter, but they did sign Mr. Tully's preliminary letter of general intentions to purchase 290 Ballard Road dated December 1, 2008.  (Id. ¶¶ 121-22; Barone Decl., Ex. J, at 129, 146-48; S).  Defendant Grossbard did not inform Plaintiff Scop that Mr. Tully was reaching out to him regarding the property.  (Pls. 56.1 Stmt., ¶ 96; Defs. Responsive Stmt., ¶ 96; Shimko Decl., Ex. B, at 81).   During this correspondence, on October 10, 2008, the owners of the PBC submitted an application to the Town of Wallkill Planning Board to subdivide the PBC into three lots.  (Id. ¶ 148; Barone Decl., Ex. V).

Subsequent to Defendants' signing of the December 1, 2008 preliminary letter of general intent, Mr. Tully refused to split a commission for any sale of the PBC with Plaintiff Scop.  (Id. ¶ 124; Barone Decl., Ex. C, at 104-05).  Plaintiff Scop then sent a Buyer's Brokerage Agreement ("Proposed Agreement") to Defendants which was dated June 7, 2008.  (Id. ¶ 127; Barone Decl., Exs. C, 138; M).  The Proposed Agreement was between Defendant Grossbard, personally and on behalf of Defendant President, Plaintiff Scop as a New York real estate broker, and YSM, and it memorialized what Plaintiff Scop understood to be the terms of the services to be rendered in the real estate transaction.  (Id. ¶¶ 128-29, 131; Barone Decl., Exs. C, at 138-52l; M).  Defendants did not sign the Proposed Agreement, and Defendant Grossbard informed Plaintiff Scop by letter dated June 19, 2008, that he had no intention of agreeing to or signing the Proposed Agreement.  (Id. ¶¶ 137-38; Barone Decl., Ex. C, at 145; U).  The reason given in the letter was that Defendant Grossbard had "never heard of a 'buyer' paying a commission fee on the purchase of a property.  I suggest any further discussions pertaining to the commission be

taken up with the owners of the property, the owner's representative, or the listing broker." (Pls. 56.1 Stmt., ¶ 107; Defs. Responsive Stmt., ¶ 107; Shimko Decl., Exs. E and H).

Plaintiff Scop sent a letter to Defendants dated January 7, 2010, demanding approximately $350,000 in commissions. (Id. ¶¶ 139-40; Barone Decl., Ex. U). In a letter of the same date, Defendants wrote to Plaintiff Scop, explaining that they had no agreement with him, and, further, that Plaintiff Scop was not involved with the purchase of 290 Ballard Road. (Id. ¶ 141; Barone Decl., Ex. U). In a letter dated January 12, 2010, YSM wrote to the owner of the PBC stating that "YSM acted as broker for the buyer, President Container and its affiliated entities and was retained to do so by President Container's principal and President Martin Grosbard [sic]. YSM was the procuring cause with respect to the purchase by President. President is now repudiating its agreement with YSM, alleging that YSM played no role whatsoever in the transaction." (Id. ¶ 142; Barone Decl., Ex. U). In response, Defendants sent a letter dated January 15, 2010, stating again that no agreement existed between themselves and Plaintiffs, and that Plaintiffs were not the procuring cause to the purchase of 290 Ballard Road. (Id. ¶ 144; Barone Decl., Ex. U).

On January 23, 2009, the Town of Wallkill Planning Board granted a preliminary approval to the PBC's subdivision application after holding a public hearing on said application. (Id. ¶ 149; Barone Decl., Ex. V). The Town of Wallkill Town Board then granted a cluster approval of the subdivision application on February 13, 2009. (Id. ¶ 150; Barone Decl., Ex. V). On April 17, 2009, the subdivision application was finally approved by the Town of Wallkill Planning Board after another public hearing was held. (Id. ¶ 151; Barone Decl., Ex. V). After the PBC was subdivided, 290 Ballard Road became "Lot 2." (Id. ¶ 152). It was during this time

that Defendants submitted an Empire Zone Certification application which, if approved, would allow Defendants to receive government benefits, credits and refunds at 290 Ballard Road.  (Id. ¶ 153; Barone Decl., Ex. B, at 83-86).

In October 2009, Defendants entered a Purchase and Sale Agreement for 290 Ballard Road which was subject to due diligence, allowing them sixty days to terminate the contract for any reason.  (Id. ¶¶ 154-55; Barone Decl., Ex. B, at 52).  From October 2009 through December 2009, Hudson Valley Crossing, LLC ("HVC"), the owner of a property located in the Town of Homtponburgh willing to custom build for Defendants, heavily pursued Defendants to purchase its property instead of 290 Ballard Road.  (Id. ¶ 157; Barone Decl., Ex. W).  The Empire Zone benefits available to 290 Ballard Road were transferrable to the HVC property.  (Id. ¶ 160; Barone Decl., Ex. J, at 209-10, 229).  Defendants terminated the Purchase and Sale Agreement of 290 Ballard Road by letter dated December 15, 2009.  (Id. ¶ 158; Barone Decl., Exs. J, at 173-74; X).  The Parties dispute the motive for Defendants' termination of the agreement, with Defendants saying that they chose to take the deal offered by HVC, and Plaintiffs arguing that they terminated to receive a better purchase price from Panattoni.  (Id. ¶ 159; Barone Decl., Ex. B, at 108; Shimko Decl., Ex. C, at 230-31).

The owner of 290 Ballard Road consequently reduced its price by approximately $2.5 million so that Defendants would purchase said property.  (Id. ¶ 161; Barone Decl., Ex. J, at 230-31).  On or about January 17, 2010, Defendant SP Realty, an entity created to be the title holder of 290 Ballard Road, acquired said property and transferred President's manufacturing operations there.  (Pls. 56.1 Stmt., ¶¶ 11, 16; Defs. Responsive Stmt., ¶ 11, 16; Shimko Decl., Ex.S; LaFazia Decl., ¶ 33 & Ex. C, at 5, 7-8, 13-18).  Defendants characterize this final sale as separate and

11

distinct from the purchase agreement entered into and then terminated on December 15, 2009. (Id. ¶ 20).  Specifically, while Plaintiffs contend that Mr. Tully negotiated the sale of 290 Ballard Road to President, Defendants claim that Mr. Tully was only involved in negotiating the terms of the proposed sale of said property, but that that particular sale did not proceed to an ultimate closing.  (Id.).  Rather, following the December 15, 2009 termination, Defendants state that they pursued the acquisition of the HVC property, and only when the owner of 290 Ballard Road offered to make substantial concessions, which were not part of the previously proposed sale, did a second Contract of Sale result in SP Realty's acquisition of 290 Ballard Road.  (Id.).

Following the final sale of 290 Ballard Road to Defendants, Mr. Tully's broker's commission was reduced to around $400,000 as a result of the sale, and Plaintiff Scop brought this action against Defendant Grossbard and President, seeking a broker's commission of $227,338, plus interest from the date of the closing.  (Defs. 56.1 Stmt., ¶¶ 162, 164; Pls. Responsive Stmt., ¶¶ 162, 164; Barone Decl., Exs. Y; Am. Compl. ¶ 62).

## II.  LEGAL STANDARD

A court grants summary judgment to a moving party "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party must first show that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is not appropriate where the evidence before the court reveals a genuine factual disagreement requiring submission to a jury. An issue is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Further, "the issue of material

12

fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. at 248-49 (citation omitted).  Unless the Court orders otherwise, a party may move for summary judgment "at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(c).  However, "where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted as a matter of course."  Sames v. Gable, 732 F.2d 49, 51 (3d Cir. 1984)(quoting Ward v. United States, 471 F.2d 667, 670-71 (3d Cir. 1973).

### III.  DISCUSSION

In their Motion for Summary Judgment, Defendants contend that they are entitled to judgment as a matter of law on four general bases: (1) Plaintiffs are not entitled to the commission on the property due to real estate licensing flaws, namely, that Plaintiff did not maintain a real estate broker's license during the course of the transaction, and Plaintiff engaged the services of an unlicensed third party to serve as co-broker and agreed to split any commission with him; (2) no valid oral agreement can be proved since the purported consideration for such commission was rendered before the date on which Plaintiffs claim the agreement was made; (3) Plaintiffs were not the procuring cause of the sale; and (4) YSM's claims must be dismissed since it has been dissolved for non-payment of franchise taxes.  (Defs. Br., at 5-40).

Plaintiffs' Motion for Summary Judgment makes a series of arguments that judgment should be granted in their favor.  First, Plaintiffs argue that Mr. Scop was legally licensed to act as a real estate broker at all relevant times of the transaction.  (Pls. Br., at 11-12).  Second,

Plaintiffs contend that Defendants entered an enforceable brokerage commission contract with Plaintiff Scop. (Id. at 12-18). Third, Plaintiffs maintain that Mr. Scop brought the Parties together, which led to the ultimate sale of the PBC property, and is thus the procuring cause. (Id. at 18-21). Even if the Court should find that Plaintiffs were not the procuring cause, however, Plaintiffs argue that they are still entitled to recover since Defendants circumvented Plaintiff Scop in their negotiations with the seller, and Mr. Scop did not need to be involved in the negotiations to be the procuring cause. (Id. at 21-23). Finally, Plaintiffs state that the fact that President's subsidiary, SF Realty, has title to the underlying property should not prevent the imputation of the actions of SP Realty onto Grossbard. (Id. at 23-24).

**A. Licensing Requirements and Plaintiffs' Entitlement to a Commission**

      **1. Entitlement to Commission: Unlicensed Participant in Relevant Brokerage Services**

Defendants argue that Plaintiffs are not entitled to collecting a commission since New York law forbids a licensed real estate broker or attorney from collecting said commission if an unlicensed person participated in the relevant brokerage services. (Defs. Br., at 5-15). Specifically, Defendants contend that Plaintiff Scop admitted that he and YSM worked with an unlicensed co-broker, Mr. Zweig, and that "but for Zweig's assistance, Plaintiffs never would have found the property on which they base their commission claim. In return for that assistance, Plaintiffs promised to split any commission collected from Defendants with him." (Id. at 6). Mr. Zweig was only licensed as a real estate broker or salesman on December 20, 2007. (Barone Decl., Ex. I). Since, Defendants contend, a violation of New York's Real Property Law licensing requirements are a strict liability offense, Plaintiffs have no defense to a violation based in a reasonable mistake of fact as to the license status of a co-broker. (Defs. Reply Br., at 5); citing

N.Y. Penal Law §§ 15.10, 15.15(2), 15.20.  Defendants thus claim that this illegal relationship

bars Plaintiffs' claims for a commission, unjust enrichment, and tort.  (Defs. Br., at 6).

　　　　Plaintiffs admit that they learned of the property at issue through Mr. Zweig, who put

them in contact with Mr. Tully, but state that once that introduction between Plaintiffs and Mr.

Tully was made, Mr. Zweig "got out of the way."  (Pls. Opp'n Br., at 3; Shimko Decl., Exs. A,

53-54, 58; V, 27, 32, 93).  Mr. Zweig never met with or spoke to Defendants, nor did he go to the

onsite walkthrough.  (Id. at 4; Shimko Decl., Ex. V, 27-29, 92).  Further, Plaintiffs allege that

Mr. Scop and Mr. Zweig had no formal written commission agreement, and when Mr. Zweig

brought the property to Plaintiff Scop's attention, he was asked by Plaintiff Scop whether he was

a broker and responded that he was "licensed to do real estate in the state of New York."  (Id.;

Shimko Decl., Exs. A, 53-55, 58, 60; V, 18).  Therefore, Plaintiffs argue that Plaintiff Scop

"reasonably believed Zweig to be a licensed broker."  (Id. at 6).  Plaintiffs assert further that

Plaintiff Scop made clear in his deposition that he would never split a commission with a non-

licensed broker.  (Id. at 4; Shimko Decl., Exs. U, 76-77).  Finally, Plaintiffs state that Mr.

Zweig's contribution to the transaction did not constitute "real estate services" as those are

defined pursuant to New York Real Property Law § 440, and that Mr. Zweig's actions were not a

substantial factor in bringing about the transaction.  (Id. at 12, 14).

　　　　New York Real Property Law Article 12-A provides that "[n]o person, copartnership,

limited liability company or corporation shall bring or maintain an action in any court of this

state for the recovery of compensation for services rendered, in any place in which this article is

applicable, in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real

estate without alleging and proving that such person was a duly licensed real estate broker or real

estate salesman on the date when the alleged cause of action arose."  N.Y. R.P.L. § 442-d

(2012).[3]   To establish as a matter of law that a broker is entitled to a commission for the selling

of real estate, the broker must demonstrate that he: (1) is duly licensed; (2) has a contract with the

party charged with paying the commission; and (3) was the procuring cause of the sale.  A-1

Realty Network of Homes, Inc. v. Kwang Ho Kim, 34 A.D.3d 705, 706, 826 N.Y.S.2d 331, 332

(App. Div. 2006).

　　　　New York courts have held that commissions cannot be recovered by real estate brokers

who are unlicensed while their services were rendered or if a co-broker was unlicensed.  See,

e.g., Galbreath-Ruffin Corp. v. 40th & 3rd Corp., 19 N.Y.2d 354, 362, 280 N.Y.S.2d 126, 130

(1967); Meltzer v. Crescent Leaseholds, Ltd., 315 F. Supp. 142, 146 (S.D.N.Y. 1970), aff'd, 442

F.2d 293 (2d Cir. 1971)(summarizing the law as prohibiting real estate brokers or salesmen to

collection a commission if they are unlicensed or if "his co-broker or salesman is unlicensed . . .

or the only interest possessed by the licensed broker was the fruit of services rendered by the

unlicensed broker").  This provision has been strictly construed by New York courts, and

compliance with its terms is mandatory.  See, e.g., American Property Consultants v. Walden

Lisle Associates Ltd. Partnership, 1997 U.S. Dist. LEXIS 9984, * 21 (S.D.N.Y. July 14, 1997);

Matter of Wertlieb, 165 A.D.2d 644, 569 N.Y.S.2d 61, 63 (App. Div. 1991); Meltzer, 315 F.

Supp. at 150.  New York Real Property Law defines a "real estate broker" as:

> any person . . . who, for another and for a fee, commission or other valuable
> consideration, lists for sale, sells, . . . or offers or attempts to negotiate a sale, . . .
> exchange, purchase or rental of an estate or interest in real estate, . . . or negotiates or

---

[3]The Parties have already agreed that the substantive law of New York applies to this action.  See YSM Realty, Inc. v. Grossbard, No. 10-5987, 2011 U.S. Dist. LEXIS 17830, * 6 n. 2 (D.N.J. Feb. 23, 2011).

offers or attempts to negotiate, a loan secured or to be secured by a mortgage, . . . or other incumbrance upon or transfer of real estate, or is engaged in the business of a tenant relocator . . . .

N.Y. R.P.L. § 440(1).

Regarding splitting commissions, New York Real Property Law states that

[n]o real estate broker shall pay any part of a fee, commission or other compensation received by the broker to any person for any service, help or aid rendered in any place in which this article is applicable, by such person to the broker in buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate including the resale of a condominium unless such a person be a duly licensed real estate salesman regularly associated with such broker or a duly licensed real estate broker or a person regularly engaged in the real estate brokerage business in a state outside of New York; provided, however, that notwithstanding any other provision of this section, it shall be permissible for a real estate broker to pay any part of a fee, commission, or other compensation received to an unlicensed corporation or an unlicensed limited liability company if each of its shareholders or members, respectively, is associated as an individual with the broker as a duly licensed associate broker or salesman.

N.Y. R.P.L. § 442.  The status of one co-broker as unlicensed "renders a co-brokering agreement unenforceable without regard to the second broker's status."  See, e.g., Meltzer, 442 F.2d at 295; Branderburger & Marx, Inc. v. Heimberg, 34 N.Y.S.2d 935, 937-38 (Municipal Ct., Bklyn 1942)(finding that the New York legislature "intended to deny recovery in such cases unless all were licensed brokers," and "to hold otherwise . . . would give many unlicensed persons an opportunity and pretense to circumvent Article 12, Section 440-a of the Real Property Law.  The statute thereby would lose its influential value, significance and meaning; and its basic purpose would be evaded."); Real Estate Multiple Listing Exchange v. Rubin, 7 Misc.2d 194, 196 (Cty. Ct. Rockland Cty. 1957)("Where one of the cobrokers was unlicensed or is unlicensed it has been held that no recovery may be had"); City Center Real Estate v. Berger, 2006 WL 5110812 (N.Y. Sup. Ct. 2006)(unpublished).  "The participation of the unlicensed broker or salesman as a substantial factor in effectuating the transaction renders it unlawful."  Meltzer, 315 F. Supp. at

17

146.  New York courts have applied § 442-d harshly, holding consistently that compliance with that provision, which prohibits the unlicensed broker from collecting his commission, is mandatory.  Id. at 150; see also, Fieger v. Pitney Bowes Credit Corp., 2002 U.S. Dist. LEXIS 17416, at * 23-25 (S.D.N.Y. Sept. 17, 2002)(affirming both federal and state courts' strict construal of § 442-d in precluding "even a licensed New York real estate broker . . . from collecting a real estate brokerage commission if he has agreed to split the commission with an unlicensed co-broker who aided him"); American Prop. Consultants v. Walden Lisle Assocs., 1997 U.S. Dist. LEXIS 9984, at * 30-31 (S.D.N.Y. July 14, 1997); Strout Realty v. Phillipson, 49 Misc. 2d 435 (Sup. Ct. 1966).  The "animating purpose of imposing this sanction on obtaining a real estate broker's license is the protection of the public, as in the case of licensing a lawyer or doctor, 'not to permit others to take advantage of the violation of the statute to escape their obligations.'" Id. at 362-63 (quoting Bendell v. De Dominicis, 251 N.Y. 305, 310 (1929)). Specifically, the licensing requirement was intended "to protect the public from inept, inexperienced, or dishonest persons who might perpetrate or aid in the perpetration of fraud." Kavian v. Vernah Homes Co., 19 A.D.3d 649, 650, 799 N.Y.S.2d 75 (2005).

The Court finds that Plaintiff Scop's agreement to split any commission on 290 Ballard Road with Mr. Zweig prevents his recovery on said commission.  The Parties do not dispute that Mr. Zweig had no right to any part of the commission at issue since he was not a licensed broker. (Defs. Br., at 12; Pls. Opp'n Br., at 6); see, e.g., Fieger, 2002 U.S. Dist. LEXIS 17416 at * 1, * 22.  The record also indicates the nature of the services provided by Mr. Zweig in relation to the transaction with Defendant President.  Following the conversation Plaintiff Scop had with Defendant Grossbard in front of his vacation home, Plaintiff Scop reached out to Mr. Zweig to

18

request his assistance in finding a property that met Defendant Grossbard's specifications. (Shimko Decl., Ex. V, at 21-22)("Zweig: My friend David Scop had told me that he has a client who . . . was looking for industrial space near Middletown looking for large space.  I don't remember the exact square footage, it was a couple 100,000 square feet.  It was important that they have rail access, that sticks out in my mind.").  Mr. Zweig then discovered the PBC property, communicated separately with Mr. Tully and Mr. Scop about said property in relation to Defendants' search for an alternative production facility, and introduced Mr. Tully to Mr. Scop.  (Barone Decl., Ex. C, at 55-57).  The record indicates that the issue of the commission was presented to Mr. Tully, and that Mr. Zweig communicated to Plaintiff Scop what he understood Mr. Tully to have said regarding any commission that would result from the transaction: "Mr. Zweig told me that Mr. Tully was only retained by the seller, excuse me, by the owner, Panattoni, to lease the property.  However, they would entertain offers to purchase the property.  But if it was a purchase and not a lease, then he was not offering any commission split and either Mr. Zweig or myself would have to get paid from the buyer.  Mr. Tully then suggested that the client lease the property."  (Id. at 57).  Mr. Zweig was also e-mailed a brochure of the property by Mr. Tully which he forwarded to Plaintiff Scop:

> Barone: The first two pages appear to be a brochure relating to the property at 260 and 290 Ballard Road; is that fair to say?
>
> Zweig: Yes.
>
> Barone: Do you know how you came into possession of these first two pages?
>
> Zweig: I believe I got it from Jim Tulley.
>
> Barone: Do you recall how Mr. Tulley sent these to you?
>
> Zweig: Via e-mail I believe.

19

> Barone: What did you do with these after you received them?
>
> Zweig: I sent it on to Mr. Scop.

(Shimko Decl., Ex. V, at 37-38).  Further, Mr. Tully communicated to Mr. Zweig the owner's

asking price:

> Barone: Did Mr. Tulley communicate to you at any time what the asking price was for either or both property there are referenced to the first two pages of Defendant's Exhibit W?
>
> Zweig: He absolutely did, just don't ask me what that number was.  I do not recall that, but absolutely.
>
> Barone: Is that something which Mr. Tulley communicated to you in person, over the phone, via e-mail or some other way?
>
> Zweig: Over the phone.
>
> ...
> Barone: When you received the first two pages of Defendant's Exhibit W, did you review them.
>
> Zweig: I'm sure I did.
>
> ...
>
> Barone: Do you know what the intended use was of the property that Mr. Scop's client was looking for?
>
> Zweig: To my recollection I believe this company, President Container, has some sort of industrial – I guess they manufacture something and I believe they wanted to move their place of business.

(Id. at 39-41).

In addition to finding the property and participating in communications regarding the

commission, the record indicates that Mr. Zweig was also directly involved at Plaintiff Scop's

request in scheduling a walk-through on August 1, 2007, whether or not such walk-through

occurred.  On July 25, 2007, Plaintiff Scop began his attempts to schedule a showing of the PBC

by e-mailing Mr. Zweig, specifically requesting a walkthrough with three to four people besides

him. (Barone Decl., Ex. K, at 5).[4]  Mr. Zweig admitted that the e-mails from Plaintiff Scop

concerned a contemplated walk-through that occurred in August 2007, and that he spoke with

Mr. Tully after the disputed walk-through.  (Shimko Decl., Ex. Q, at 47, 57).

     Plaintiff Scop continued to rely on Mr. Zweig's services after August 2007 with respect

to reaching out to Mr. Tully about 290 Ballard Road.  Mr. Zweig admits to having communicated

with Mr. Tully more than once regarding the property.  (Id., Ex. V, at 28-29).  Plaintiff Scop

admits to asking Mr. Zweig to directly contact Mr. Tully regarding the status of Defendant

President's Empire Zone application, and after Mr. Zweig contacted him, Plaintiff Scop followed

up to see what response, if any, Mr. Tully gave to Mr. Zweig.  (Barone Decl., Ex. C, at 113-115).

Mr. Zweig notified Plaintiff Scop that Mr. Tully did not give him a response to that inquiry.

(Id.).  Also, on October 12, 2007, Plaintiff Scop told Mr. Zweig to try to get a commission from

Mr. Tully, stating, "If no go, I'll still split" the commission.  (Id., Ex. K, at 18).  Plaintiff Scop

followed up again with Mr. Zweig on the same day.  (Id., Ex. K, at 19).  Mr. Zweig responded

that he didn't think Mr. Tully would give any commission, but said that he would give it a shot.

(Id., Ex. Q, at 73-74).  Finally, Plaintiff Scop notified Mr. Zweig on June 2, 2008 that Defendants

had put in an offer of $25 million on 290 Ballard Road.  (Id., Ex. K, at 22).

     The Parties do not dispute the fact that Plaintiff Scop had an agreement with Mr. Zweig

that he would split any commission obtained should Mr. Zweig find an appropriate property for

---

[4]While Plaintiffs contest the admissibility of the e-mails provided in said exhibit as hearsay, the e-mails specifically from Plaintiffs Scop or YSM are not hearsay pursuant to Fed. R. Ev. 801(d)(2) as they are statements of an opposing party "made by the party in an individual or representative capacity."

Defendant President.  In his January 30, 2012 deposition, Plaintiff Scop stated as follows:

> Barone: ... [W]as Mr. Zweig the person who found 290 Ballard Road in connection with the criteria that President Container had for a new location?
>
> Scop: Yes.
>
> Barone: And at the time is it your understanding he was a licensed real estate broker?
>
> Scop: As I answered before, yes.
>
> ...
>
> Barone: And did you arrive at any agreement with him with respect to paying him for any services in connection with this matter?
>
> Scop: Yes, we did.
>
> Barone: And what was the agreement?
>
> Scop: The agreement was I would give him half of the commission that I earned.
>
> Barone: When did you make this agreement with him?
>
> Scop: As soon as he told me he found a qualifying property.
>
> Barone: So is it fair to say that he searched for a property before you and he made an agreement for a commission?
>
> Scop: Yes.
>
> Barone: And is there any written document that sets forth the terms of this agreement?
>
> Scop: No.

(Barone Decl., Ex. C, 58-60).  Even as late as October 12, 2007, Plaintiff Scop continued to

believe himself to be in a co-brokerage arrangement with Mr. Zweig:

> Barone: And is it a true statement that President Container was the client that he, Mr. Zweig, sent Mr. Tully for that property?
>
> Scop: In brokerage parlance, yes.  When you co-broker[,] you sit at the same side of the table.

Barone: So as of that time, October 12, 2007, was it your understanding that you were a co-broker with Mr. Zweig with respect to this property and President Container's interest in the property?

Scop: Yes.

Barone: Had you ever disclosed to President Container that you were working with another broker?

Scop: No.

(Barone Decl., Ex. C, at 116-117).  Further, Plaintiff Scop asked Mr. Zweig to be a plaintiff in

the instant litigation, but Mr. Zweig declined to be a party:

Barone: Is it still your intention if you have a financial recovery in this lawsuit to pay Mr. Zweig one half of the commission?

Scop: Yes.

Barone: And he's expecting to get paid?

Scop: Yes.

Barone: Did you ever have any discussion with him whether or not he should be a party to this lawsuit?
. . .

Scop: It came up once.  I asked him would he like to be a plaintiff in the litigation.  He asked me, "Do I need to be?"  I said, "Speak to your attorney.  I see no reason why you need to be."
. . .

Barone: Did he respond to you whether or not he wanted to be a plaintiff in this lawsuit or not?

Scop: He responded in the negative.

(Shimko Decl., Ex. U, at 73-77).[5]

---

[5]In his deposition, Mr. Zweig stated that he didn't believe Plaintiff Scop asked him to be a part of the litigation, but when asked if that was something he would be likely to remember, he stated, "I'm sure I would have said I wanted to stay as far away from this as possible."  (Shimko

While the Parties do not dispute that Plaintiff Scop had an agreement to split any commission with Mr. Zweig, Plaintiff Scop argues that he is still entitled to the commission since he reasonably believed Mr. Zweig to be licensed.  (Pls. Opp'n Br., at 4, 6).  However, Plaintiffs do not cite, nor can this Court find, any case law supporting their contention that Plaintiff Scop's reasonable belief that Mr. Zweig was a licensed broker exempts him from the prohibition against recovering a commission which all parties agree was intended to be split with an unlicensed broker or salesperson.  (Pls. Opp'n Br., at 4, 6).  Further, the record indicates that, despite Mr. Zweig having informed him that he was licensed, Plaintiff Scop nevertheless conducted a search to investigate whether Mr. Zweig was licensed and did not recall whether or not Mr. Zweig was licensed at that time:

> Scop: . . . I asked Mr. Zweig specifically, are you a licensed broker.  He said I am licensed to do real estate in the State of New York.  Based on that I offered him a commission split.
>
> Barone: . . . [A]s of 2007 was anyone in your office licensed in any state other than New York to sell real estate?
>
> Scop: Not that I know of.  (Barone Decl., Ex. C, at 86).
>
> . . .
>
> Barone: Have you ever done anything to ascertain whether or not he is a licensed real estate salesperson or broker in the State of New York?
>
> Scop: I did.
>
> Barone: When did you do that?
>
> Scop: Back in — end of '07, beginning of '08.
>
> Barone: How did you go about doing that?

_____

Decl., Ex. V, at 34-35).

24

Scop: Looked on the Department of State website.

Barone: What did you find?

Scop: I found a company he was associated with.  I don't remember if he specifically was listed as a licensed broker or salesperson.

Barone: What was the company that he was associated with at that time?

Scop: He was associated with AIG Group.  I don't remember if that was the one that – what I believe your question is licensed as a real estate brokerage.

Barone: Did the result of your search indicate that, at that time, Heshy Zweig was licensed as a real estate broker or salesperson?

Scop: I do not remember if, at that time, Heshy Zweig was licensed as a salesperson or a real estate broker.

Barone: Is it your understanding that you, as a licensed real estate broker, can share a commission with someone who is not licensed as a broker or salesperson?

Scop: It is not.

Barone: It's not your understanding or you can't do it?

Scop: I'm not trying to be wise by saying yes to both, but my understanding is that one is not allowed to share a commission.  You can't call it a fee with a non-licensed broker or salesperson.  My opinion is that is not allowed.

Barone: Is it your opinion that one half of what you were charging President Container was due to Mr. Zweig?

Scop: Yes.

Barone: If you found out that he wasn't licensed at the time as a real estate broker or salesperson, would you make payment to him of one half of the amount that you're charging my client?

Scop: No.  I would only make payment to a licensed real estate salesperson or broker.

(Shimko Decl., Ex. U, at 73-77).  In light of federal and state courts' strict construal and harsh

application of § 442 to preclude recovery by a broker who agrees to split his commission with an

unlicensed broker, the absence of any case law supporting a "reasonable belief" exception to the application of § 442, and the facts as stated on the record, the Court rejects Plaintiffs' argument that "reasonably believing" that an unlicensed broker was licensed provides an exemption from the application of § 440-a et seq.  See, e.g., Meltzer, 315 F. Supp. at 151 ("we are bound by the fact that New York law on the subject is unequivocal and is given full force and effect by New York state courts. . . . [C]ompliance with § 442-d . . . is mandatory.").  The purpose of statutory regulation regarding such licensing is both "to protect dealers from unlicensed persons acting as brokers, and to protect the public from inept, inexperienced or dishonest persons who might perpetrate or aid in the perpetration of frauds upon it, and to establish protective or qualifying standards to that end." Small v. Marchese, 98 Misc.2d 295, 296 (1st Dept. 1978)(internal citation omitted).  The reasonable belief of a licensed broker that an unlicensed broker was in fact licensed frustrates the purpose of such regulation in that it does not protect the public from "inept, inexperienced persons."  So as not to contravene the intent of the legislators or to create an end-run around said legislators' purposes in enacting such regulations, the Court will not read into § 442 an exception based on a licensed broker's reasonable belief.

Plaintiffs also argue that, since Mr. Zweig did not perform real estate services and his services were not a substantial factor in rendering the transaction, Zweig is still entitled to his commission and may bring a claim against Defendants under New York law.  (Pls. Opp'n Br., at 11-14).  Specifically, Plaintiffs contend that Mr. Zweig's introduction of Plaintiff Scop and Mr. Tully does not fall within the definition of the activities of a "real estate broker" under § 440 of the New York Real Property Law, and since he never met with or spoke to Defendants.  (Id. at 12-13).  Further, Plaintiffs point to language in Meltzer which states that an unlicensed broker's

26

activities need be a "substantial factor" in bringing about the transaction, and as measured against the transaction as a whole, Mr. Zweig's introduction is not "substantial."  (Id. at 14; see Meltzer, 315 F. Supp. at 146, 150).  However, as cited in detail above, Mr. Zweig's involvement in the transaction was not limited to an introduction: Plaintiff Scop relied on him to schedule a walkthrough of the property, and at Plaintiff Scop's request, Mr. Zweig continued speaking with Mr. Tully about Defendants' Empire Zone application as well as the commission.  Further, Mr. Zweig had many communications with Mr. Tully regarding the property, including whether the property would be available for lease or purchase.  As late as October 12, 2007, Plaintiff Scop still believed Mr. Zweig to be a co-broker in the transaction, and his continued and attested involvement indicate significant participation given the limited amount of time within the entire life of the property procurement that Plaintiff Scop's brokerage services were expressly or tacitly approved by Defendants.  Regarding whether Mr. Zweig's activities constituted the services of a "real estate broker," New York's Real Property Law is explicit and broad in its bar for recovery extending to those who share a commission with any person performing "any service, help or aid rendered . . . to the broker in buying [or] selling any real estate."  N.Y. R.P.L. § 442.  It is clear from the record that Mr. Zweig did provide a "service, help or aid" in selling 290 Ballard Road as documented by Plaintiff Scop and Mr. Zweig's depositions and Plaintiff Scop's e-mail correspondence.  Further, any exception based in Mr. Zweig's services being an "incidental feature" of his contractual responsibilities, for example, regarding financial services, is not supported by the record as such services were not ultimately provided and his role was limited to the real estate transaction.  See Fieger, 2002 U.S. Dist. LEXIS 17416, at * 27.

Finally, while Plaintiffs attempt to distinguish the instant case from those cited in

27

Defendants' briefs, those attempts are unavailing.  (See Pls. Opp'n Br., at 6-11).  Plaintiffs first

challenge Defendants' construal of the holding in City Center Real Estate v. Berger, 2006 WL

5110812 (N.Y. Sup. Ct. 2006)(unpublished).  Defendants cite to Berger to support their argument

in favor of granting them summary judgment since, in that case, an attorney-broker was also

denied his claim "to a broker's commission on summary judgment due to his agreement to split

his commission with an unlicensed co-broker."  (Defs. Br., at 8).  Plaintiffs, however, argue that

Berger in fact supports allowing Plaintiff Scop to keep his commission since, in that case,

plaintiff seller's broker, City Center, was able to retain his commission fee even though he

entered into an agreement with defendants, the buyer's brokers: Berger, a licensed broker, and

Fleischman, an unlicensed broker.  (Pls. Opp'n Br., at 8).  However, while it is true that the

seller's broker, who had reached a written agreement with the owner to receive a brokerage fee of

4% of the gross sale price of the property, was able to retain that commission while Berger and

Fleischman were not, the case is distinguishable from the instant case since the plaintiff broker

was suing defendants licensed and unlicensed brokers based on a written agreement entered

between them that was deemed illegal.  Berger, 2006 WL 5110812, at * 1-2.  The agreement was

explicit that the granting of a 2% co-brokerage fee to the defendants was conditioned upon the

initial payment to the seller's broker of the 4% brokerage fee, as stipulated in a separate

agreement. Id. at 2.  Therefore, the only agreement at issue in the case was the agreement

between the seller's broker and the buyer's brokers, not the initial commission agreement as such

between the seller's broker and the seller, which commission had already been received by the

plaintiff.  See id. at 7.  In this case, Plaintiffs, who had an agreement with an unlicensed broker,

is suing not Mr. Tully, the seller's broker based on any agreement reached with him, but rather

28

the buyer Defendants who purportedly reached an agreement on a commission with Plaintiff Scop (and unbeknownst to Defendants, an unlicensed broker).  Said agreement must be either deemed legal and enforceable by this Court or illegal on the grounds of its contravention of New York's Real Property Law, it having been deemed illegal by this Court, the "indivisible unit" of Plaintiff Scop and Mr. Zweig cannot enforce it just as plaintiff Berger could not enforce his. Berger illustrates how an "indivisible unit" of licensed and unlicensed brokers – such as Plaintiff Scop and Mr. Zweig – have been found by courts to have voided the portion of the commission agreement as between themselves and brokers on opposing sides of the transaction, not as between the seller and his broker.

Second, Plaintiffs reinterpret Good Life Realty v. Massey Knakal Realty of Manhattan, LLC as supporting their contention that Plaintiff Scop should not forfeit his commission even thought a real estate deal included an unlicensed broker.  (Pls. Opp'n Br., at 10; see 2011 N.Y. Misc. LEXIS 669 (N.Y. Sup. Ct. 2011)).  However, in that case, just as in Berger, the commission at issue in the litigation was a commission paid by the seller which the seller's broker, defendant Massey Knakal Realty Services ("MKRS"), and plaintiff buyer's brokerage company, Good Life Realty, had agreed to split.  2011 N.Y. Misc. LEXIS 669, at * 1-4, 7. Additionally, like in the instant case, the unlicensed broker was only in agreement with a licensed broker on one side of the transaction to split their share of the commission.  See id. at * 16.  The licensed and unlicensed brokers in the co-brokerage agreement in Good Life and Plaintiff Scop and Mr. Zweig in the instant case are more like the "indivisible unit" between the buyer's brokers in Berger, and licensed co-brokers who have consistently been found unable to recover their portion of the commission are those who have agreed to share a commission with unlicensed

brokers on the same side of the splitting transaction.

Plaintiffs attempt to distinguish Meltzer by arguing that the relationship between the unlicensed broker and the seller was much more attenuated in the instant case where Mr. Zweig did not enter a joint agreement with President and Mr. Zweig performed a limited introductory role after which he "was out of the scene." (Pls. Opp'n Br., at 11).  In Meltzer, the Southern District of New York held that plaintiff Meltzer, a licensed broker, could not bring a claim to recover his commission where his co-broker, Mr. Gareh, was not licensed as a real estate broker and played a principal part in negotiating the underlying real estate mortgage loan transaction. 315 F. Supp. at 151-52.  Meltzer is similar to the instant action in that both licensed brokers conceded that they had reached an agreement to split commissions with unlicensed co-brokers. See id. at 146.  Further, while the facts in Meltzer do indicate relatively more involvement in the mortgage loan transaction by the unlicensed broker than Mr. Zweig's participation in the transaction at issue in this matter, the court in Meltzer was nevertheless clear regarding the breadth of the prohibition on splitting commissions with unlicensed brokers under New York law.  Specifically, the court stated as follows:

> We recognize that strict application of § 440-a et seq. might in some cases preclude recovery by a broker even though he or his unlicensed broker had been instrumental in successfully bringing about the consummation of a real estate transaction of mutual benefit to the parties.  Whatever our reservations might be as to such harsh application of the law – and we are farm from intimating here that plaintiff could establish his claim – we are bound by the fact that New York law on the subject is unequivocal and is given full force and effect by New York state courts.  In fact compliance with § 442-d, which prohibits the unlicensed broker from collecting his commission, is mandatory.

Id. at 150.  Finally, as the Court has stated infra, Mr. Zweig's role was not limited to the mere introduction of Plaintiff Scop to Mr. Tully, and his involvement in the transaction in proportion to Plaintiff Scop's involvement relative to the entire transaction as consummated by Defendants'

30

purchase of 290 Ballard, was not incidental.

      To conclude, there is no genuine dispute between the parties that Plaintiff Scop and Mr. Zweig had a co-brokerage agreement to split any commission made on the 290 Ballard Road property and that Mr. Zweig was not a licensed real estate broker at that time.  Further, the Court agrees with Defendants that no reasonable jury could find that Mr. Zweig did not "service, help or aid" in the contributions Plaintiff Scop made towards Defendants' final purchase of 290 Ballard Road.  Accordingly, Defendants' Motion for Summary Judgment is granted.

**B.  Plaintiffs' Tort Claims: Unjust Enrichment and Fraudulent Inducement**

      New York courts have also precluded tort claims brought by licensed real estate brokers who have agreed to split commissions with unlicensed co-brokers pursuant to Article 12-A of the New York Real Property Law.  See, e.g., Kennedy v. Huntington Hartford, 31 A.D.2d 616, 295 N.Y.S.2d 751, 752 (App. Div. 1968)(finding that plaintiff's arrangement to split his commissions with unlicensed brokers fell within the scope of Article 12-A, and "[t]he public policy embodied in that article bars plaintiff from recovery, either in contract or in tort, for the services in question."); Good Life, Inc. v. Massey Knakal Realty of Manhattan, LLC, 2011 N.Y. Misc. LEXIS 669, at * 17 (N.Y. Sup. Ct. 2011)("Unlicensed persons cannot evade the licensing requirements by invoking equitable remedies to recover in tort rather than contract."); Coldwell Banker Mid Plaza Real Estate, Inc. v. Guindi, 889 N.Y.S.2d 881, at * 13 (N.Y. Sup. Ct. 2009)(holding that plaintiffs were barred from asserting an unjust enrichment claim because they were legally prohibited from collecting a commission); see also Melius v. Breslin, 46 A.D.3d 524, 527, 846 N.Y.S.2d 645, 647 (App. Div. 2007)(barring claim for unjust enrichment because plaintiff had "unclean hands" for attempting to enforce an illegal agreement).

31

**IV.  CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is

GRANTED.  Plaintiffs' Motion for Summary Judgment is DENIED.  An appropriate Order

accompanies this Opinion.


DATED: June 20, 2012                                    /s/ Jose L. Linares
                                                        United States District Judge

32